1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11  DEBORAH PLUM,                    )
                                     )
12              Plaintiff,           )
                                     )      No.  CV-08-6121-HU
13       v.                          )
                                     )
14  MICHAEL J. ASTRUE,               )
    Commissioner of Social          )      FINDINGS & RECOMMENDATION
15  Security,                        )
                                     )
16              Defendant.           )
    ─────────────────────────────────)

17
    Julianna Coons
18  COONS & COONS
    P.O. Box 11650
19  Eugene, Oregon 97440

20       Attorney for Plaintiff

21  Karin J. Immergut
    UNITED STATES ATTORNEY
22  District of Oregon
    Brittania I. Hobbs
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  Thomas M. Elsberry
    SPECIAL ASSISTANT UNITED STATES ATTORNEY
26  Social Security Administration
    701 Fifth Avenue, Suite 2900 M/S 901
27  Seattle, Washington 98104-7075

28       Attorneys for Defendant


1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Deborah Plum brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction under 42 U.S.C. § 405(g). I recommend that the Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB on June 29, 2004, alleging an onset date of October 31, 2001. Tr. 71-73. Her application was denied initially and on reconsideration. Tr. 37-38.

Plaintiff filed an untimely request for a hearing on June 17, 2005, but good cause was established for the late filing. Tr. 19. On February 16, 2007, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 389-441. The hearing was continued to September 21, 2007. Tr. 442-64.

On October 26, 2007, the ALJ found plaintiff not disabled. Tr. 17-35. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 5-7.

FACTUAL BACKGROUND

In a July 6, 2004 Disability Report (Form SSA-3368), plaintiff alleged disability based on diabetes, hepatitis C, pancreatitis, and "mental." Tr. 74. At the time of the February 2007 hearing, plaintiff was fifty-four years old. Tr. 71. She had turned fifty-five by the September 2007 hearing. Id. Plaintiff completed one year of college. Tr. 79. Her past relevant work is as a legal assistant. Tr. 32, 75-76.

I. Medical Evidence

The first medical record in the Administrative Record is an Emergency Department Report from McKenzie-Willamette Hospital dated

2 - FINDINGS & RECOMMENDATION

October 31, 2003.  Tr. 146-47.  Plaintiff went to the emergency room to obtain her regular supply of methadone which she was supposed to have received from her regular physician, Dr. Edward Reeves, D.O. Tr. 147.  Apparently, Dr. Reeves had to leave his office suddenly due to an emergency and did not have time to make arrangements for his methadone patients.  Id.  Somehow, the Emergency Department at the hospital was informed that they could expect to see multiple methadone patients over the weekend, seeking enough to get them through to the following Monday, when Dr. Reeves would be back in his office.  Id.  Plaintiff was given ten doses of methadone and ten doses of Klonopin, a benzodiazepine used to treat panic disorder and anxiety.  Id.

On December 2, 2003, plaintiff returned to the emergency room at McKenzie-Willamette Hospital, complaining of high blood sugar.  Tr. 141-42.  Plaintiff reported that because of financial problems, she had made the choice to discontinue all of her medications in order to maintain her home and eat.  Tr. 141.  She reported that she had prescriptions available for her oral hypoglycemics, but not for her methadone and Klonopin for her chronic neck pain.  Id.  Plaintiff stated that she was supposed to take two oral hypoglycemics, of which one was Metformin.  Id.  Other than what was noted as "her chronic pain issues," plaintiff stated she had no medical problems with no complications noted from her diabetes.  Id.  She did report a previous history of drug and alcohol abuse, indicating that it was "years ago," but stating that she had hepatitis C.  Id.

At the time, plaintiff's blood sugar was 350, with an "acetone positive 1-4."  Id.  She was given four units of regular insulin,

3 - FINDINGS & RECOMMENDATION

but because of the absence of any records regarding her
medications, the physician was unwilling to provide her with oral
hypoglycemics. Id. She was instructed to follow up with her
primary care physician the next day. Id. She was expressly told
that the emergency department would not address her chronic pain
issues, which she needed to address with her primary care provider.
Id. The emergency department physician's "focus is [plaintiff's]
diabetes which is not complicating at this point." Tr. 141-42.
Plaintiff was warned that she would end up back in the same
situation if she did not start her oral hypoglycemics at the
appropriate dose. Id.

On March 21, 2004, plaintiff's son took her to the emergency
room at Sacred Heart Medical Center when he arrived for a visit and
found her lethargic and not functioning well. Tr. 160.
Plaintiff's son reported that she had a history of methamphetamine
use, and had been using it recently, as well as drinking alcohol.
Id. Plaintiff initially denied the son's report, but then admitted
it. Id. She did not use intravenous drugs, and reported taking
methadone for chronic pain management. Id. Her urine tested
positive for amphetamines. Tr. 158.

Plaintiff's blood sugar was over 1000, with a serum sodium of
160. Tr. 157. She was admitted to the hospital with hyperosmolar
syndrome[1]. Id. She had lost weight and was described as almost

---

[1] According to the Mayo Clinic, hyperosmolar syndrome
occurs in diabetics with blood sugars over 600; the "blood
becomes thick and syrupy" and the excess sugar passes from the
blood to the urine, which triggers a filtering process that draws
tremendous amounts of fluid from one's body. Left untreated, it
can lead to life-threatening dehydration. www.mayoclinic.com

4 - FINDINGS & RECOMMENDATION

1  emaciated.  Tr. 157-58.  Tr. 158.  It was noted that she was a
2  poorly maintained diabetic.  Id.

3      While in the hospital, plaintiff was seen by Dr. David Calder,
4  M.D., on March 24, 2004, for consultation regarding her diabetes
5  care.  Tr. 154-55.  He noted that since her admission to the
6  hospital, she had been treated with intravenous fluids and had
7  responded favorably to that.  Tr. 154.  Dr. Calder noted that in
8  addition to her problems with diabetes, plaintiff had a difficult
9  social situation.  Id.  He noted that she was on chronic methadone
10  therapy for neck pain secondary to an automobile accident.  Id.  He
11  also noted her history of methamphetamine use and hepatitis C.  Id.

12      Dr. Calder's impressions were diabetes mellitus with insulin
13  deficiency, methadone use for chronic pain, and difficult social
14  situation.  Tr. 155.  He discussed various options for management
15  of her diabetes with her and decided the safest insulin would be
16  Lantus, along with the use of NovoLog when she eats.  Id.  Dr.
17  Calder noted that plaintiff's insurance coverage was questionable
18  and that she might have the Oregon Health Plan.  Id.  He was unsure
19  if it covered Lantus, but he thought he could keep her supplied
20  with samples until she was improved, at which time she might need
21  to switch to a different insulin regimen.  Id.  He agreed to follow
22  her in regard to her diabetes, but noted she would need a different
23  primary care physician to assist with other health care needs.  Id.

24      At the time of her discharge on March 27, 2004, her primary
25  diagnosis was hyperglycemic, hyperosmolar, nonketotic state with
26  associated confusion.  Tr. 149.  Given her extremely thin state,
27  plaintiff also had a nutritional status assessment by a dietitian.
28  Id.  She received a day of intensive education about her disease

5 - FINDINGS & RECOMMENDATION

1  process and voiced understanding of the process, the need to eat
2  well, and the need to regularly monitor her blood sugars.  Tr. 150.
3  Her methadone dose was altered, to a total of 75 milligrams per day
4  instead of 80 milligrams per day.  Id.  This seemed to improve her
5  level of consciousness without affecting her pain control.  Id.
6  The discharge report notes that there was no evidence of current
7  methamphetamine use at the time of the hospitalization.  Id.
8  Plaintiff was discharged home to the care of her husband.  Id.  Dr.
9  Michael Laurie had agreed to accept her as a patient for primary
10  care.  Id.

11      After her hospital discharge, plaintiff followed up as an
12  outpatient with Dr. Calder on April 9, 2004.  Tr. 199-200.  She had
13  improved in monitoring her morning blood sugars, but was not doing
14  as well in recording other blood sugars during the day.  Id.  Dr.
15  Calder noted that he spent a lot of time discussing the proper
16  insulin/carbohydrate ratio with plaintiff.  He gave her a handout,
17  asked her to keep a food diary, and to return to see a dietitian.
18  Tr. 200.

19      Plaintiff saw Dr. Laurie on April 12, 2004 to establish care.
20  Tr. 167-68.  Plaintiff reported her past medical history to Dr.
21  Laurie as including chronic neck pain from a 2000 motor vehicle
22  accident for which she takes methadone for pain relief, diabetes,
23  depression, and sleep disturbance.  Tr. 167.  As for her
24  depression, she told Dr. Laurie that she had used multiple
25  antidepressants in the past, but did not want to take them because
26  they made her more depressed.  Id.  She stated she was not
27  suicidal.  Id.  As for the sleep disturbance, she stated that she
28  gets nightmares, but uses Klonopin to help with that.  Id.

6 - FINDINGS & RECOMMENDATION

1  Plaintiff reported that she did not work, she smoked cigarettes,
2  she had not used methamphetamines for a week, did not abuse
3  alcohol, and used no injectable drugs.  Tr. 168.

4       On physical examination, Dr. Laurie noted that plaintiff
5  pointed to her left posterior trapezius muscle area where there was
6  some discomfort, but her neck was supple.  Id.  He talked with her
7  about her neck pain and told her she had to be compliant with her
8  medications and could not have the prescriptions early.  Id.  Dr.
9  Laurie also warned her that he would not fill them if she lost
10 them.  Id.  He asked her to occasionally do a urine test to see if
11 she was still abusing methamphetamines.  Id.  He did so, because in
12 his opinion, she was at risk for being abusive with the methadone
13 and could potentially do herself harm with "that and her
14 depression."  Id.  He told her she needed to get her old medical
15 records to document her need for the methadone, which he described
16 as a "strong narcotic."  Id.  He renewed her prescription for
17 Klonopin.  Id.

18      Following her initial visit with Dr. Laurie, plaintiff
19 returned to Dr. Calder on April 23, 2004, to follow-up with her
20 diabetes care.  Tr. 197-98.  Dr. Calder noted how much better she
21 looked compared to when he saw her in the hospital.  Tr. 197.  She
22 had put on some weight, and was bright and alert.  Id.  She talked
23 about going back to work.  Id.  He noted her struggle with
24 financial problems and the lack of insurance to cover medications
25 and insulin.  Id.  He indicated this was an ongoing issue, although
26 he remarked the situation might improve if she went back to work.
27 Id.

28      He noted that she was working hard to count carbohydrates.
7 - FINDINGS & RECOMMENDATION

1   <u>Id.</u>  Although she was unable to do the ideal amount of blood sugar
2   testing because of her inability to buy strips, she had done some
3   and Dr. Calder reviewed the information with her.  <u>Id.</u>  Dr. Calder
4   thought plaintiff would be able gain control of the disease at some
5   point.  Tr. 198.

6       Plaintiff's next visit with Dr. Laurie was May 12, 2004.  Tr.
7   165-66.  In general, plaintiff was feeling better, although she had
8   a possible urinary tract infection.  Tr. 165.  He noted that her
9   affect was good and that she had gained some weight.  <u>Id.</u>  Dr.
10  Laurie remarked that plaintiff stated that because of stress, she
11  thought she needed to take the Klonopin twice per day instead of
12  just once at night.  <u>Id.</u>

13      Dr. Laurie noted that he had reviewed plaintiff's records
14  which showed a history of elevated alkaline phosphatase level and
15  elevated blood sugar.  <u>Id.</u>  He filled her prescription for
16  methadone and told her she could ask for it monthly.  <u>Id.</u>  He wrote
17  her a prescription for twice daily Klonopin.  <u>Id.</u>  He referred her
18  to a female gynecologist for routine gynecologic care.  <u>Id.</u>

19      The records show no additional visits with Dr. Laurie.
20  Plaintiff saw Dr. Calder again on June 1, 2004, and he reported
21  that while she was still struggling with her blood sugars and the
22  insulin/carbohydrate ratio, she showed marked improvement in her
23  level of understanding and management.  Tr. 195-96.  However, by
24  the time she saw him again on July 15, 2004, the degree of control
25  she had over her diabetes was unclear.  Tr. 193.  Dr. Calder noted
26  that she did not bring in any blood sugar records and she failed to
27  get some laboratory tests done after he had ordered them in June.
28  <u>Id.</u>

8 - FINDINGS & RECOMMENDATION

1        On July 12, 2004, plaintiff established care with Dr. Sharon
2    Meyers, D.O.  Tr. 218-19.  Plaintiff's primary complaint was about
3    the reduction in her dose of methadone, which she reported had been
4    120 milligrams per day before it was changed.  Tr. 218.  She said
5    she was not doing well on the reduced dose.  Id.  Plaintiff told
6    Dr. Meyers that she had lost quite a bit of weight in the previous
7    year because of financial problems which precluded her access to
8    food.  Tr. 218-19.  She also stated that she was "coming around
9    with regard to that," even though she reported having quite a bit
10   of stress in her life.  Tr. 219.

11       Dr. Meyers started plaintiff on Enalapril, a drug used to
12   treat hypertension.  Tr. 219.  She refilled her methadone at 40
13   milligrams, three times per day, because this is what plaintiff
14   reported was her previous dose.  Id.  Dr. Meyers indicated she
15   would see plaintiff again in three months, or sooner if needed.
16   Id.

17       On August 23, 2004, a Psychiatric Review Technique Form (PRTF)
18   rated plaintiff as having a not severe impairment.  Tr. 173.
19   Although it noted that she had a non-specified anxiety disorder, it
20   also noted that she had behavioral changes or physical changes
21   associated with the regular use of substances that affect the
22   central nervous system.  Tr. 181.  The anxiety-related disorder was
23   noted, as was liver damage.  Id.  The PRTF notes her
24   methamphetamine abuse, and methadone maintenance therapy.  Id.

25       In the "B" listing of functional limitations, plaintiff was
26   rated as having mild difficulties in social functioning, and mild
27   difficulties in maintaining concentration, persistence, or pace.
28   Tr. 183.

9 - FINDINGS & RECOMMENDATION

On September 8, 2004, plaintiff saw Dr. Calder again, apparently for the last time as there are no other records of visits with him in the Administrative Record. Tr. 190-91. Dr. Calder noted that plaintiff had "fallen off the wagon a little bit" with her blood sugar monitoring. Tr. 190. Nonetheless, overall, Dr. Calder noted that she had improved control and he congratulated her on her efforts. Tr. 191.

Plaintiff complained about pain in her right foot. Id. She described pain in the distal metatarsal region when she put weight on the foot first thing in the morning. Id. The pain went away as she walked around. Id. On physical exam, her foot appeared normal with no tenderness. Id. Dr. Calder diagnosed her with metatarsalgia. Id. He discussed the management of this condition with her. Id. He indicated that she should see him again in three months. Id.

Plaintiff returned to Dr. Meyers on November 24, 2004. Tr. 216-17. Plaintiff told Dr. Meyers she had not been compliant with her medications because she had not taken her blood pressure pills that day. Id. Plaintiff reported being under a lot of pressure because she was trying to rent a home. Id. Plaintiff's physical exam was routine, and in the section remarking on her mental status, Dr. Meyers noted that her affect was normal. Tr. 217. Dr. Meyers assessed her diabetes as being in "questionable control." Id. She indicated plaintiff should follow up with her in three months. Id.

On February 4, 2005, plaintiff returned to Dr. Meyers for follow up. Tr. 214-15. Between her last visit and this one, plaintiff had been incarcerated and was taken off Klonopin during

10 - FINDINGS & RECOMMENDATION

that time.   Tr. 214.   Dr. Meyers expressed concern about plaintiff's failure to obtain blood work as ordered.   Dr. Meyers also told plaintiff she would not refill the Klonopin until plaintiff saw a psychiatrist.   Tr. 215.   No physical exam was performed, but Dr. Meyers described plaintiff as being fairly agitated and emotionally distraught.   Id.   She assessed plaintiff as having diabetes with questionable control, and anxiety with possible drug seeking behavior.   Id.   She asked plaintiff to get the blood work done and advised her that they may not be able to continue with the doctor-patient relationship if plaintiff could not be more compliant.   Id.

On March 29, 2005, Dr. Meyers noted that plaintiff's incarceration, which she first noted in her February 4, 2005 chart note, lasted nine days, during which plaintiff did not receive Klonopin or methadone.   Tr. 209-10.   Plaintiff did have her diabetes-related blood work done and Dr. Meyers noted that while her hemoglobin Alc was high, the rest of her numbers were good. Tr. 209.   Dr. Meyers assessed plaintiff's diabetes as being in poor control.   Tr. 210.   Although the Administrative Record contains no record of a visit by plaintiff to Dr. Calder after September 8, 2004, Dr. Meyers's March 29, 2005 chart note states that plaintiff was seeing Dr. Calder for her diabetes care.   Tr. 210.

On June 9, 2005, Dr. Meyers reported that plaintiff was homeless, although she and her family were staying with someone. Tr. 207.   Plaintiff had no medical complaints, although plaintiff reported that her husband had told her that she had had at least two seizures.   Id.   Plaintiff's husband was not present to further describe the incidents.   Id.

11 - FINDINGS & RECOMMENDATION

1    Plaintiff's blood pressure was elevated. Tr. 208. Dr. Meyers
2    recommended that plaintiff check her blood pressure as an
3    outpatient and to keep close tabs on her insulin. Id.

4    The last time plaintiff saw Dr. Meyers was on August 16, 2005.
5    Tr. 204-05. In contrast to her other visits which had been to
6    establish care, review her diabetes wellness plan, and check her
7    medications, this time plaintiff complained of pain as her chief
8    complaint. Tr. 204. Specifically, knee, elbow, and shoulder pain
9    are noted in the "chief complaint" section of the chart note. Id.

10   Dr. Meyers wrote that plaintiff came in to try to negotiate
11   pain medications. Tr. 204. Plaintiff wanted to change from taking
12   forty milligrams of methadone three times per day, to four times
13   per day. Id. Dr. Meyers noted that plaintiff's situation and
14   history changed frequently. Id. As an example, she noted that
15   plaintiff had been telling her for several months that she was
16   going to move to the coast, but presently told her that she had a
17   part-time job in Eugene. Id. She expressed comfort with Dr.
18   Meyers's care, but Dr. Meyers told plaintiff that she was not a
19   chronic pain management doctor. Tr. 204-05.

20   Despite the pain complaints in the "chief complaint" section,
21   Dr. Meyers noted that plaintiff was in no acute distress. Tr. 205.
22   Her impression, however, was of chronic pain. Id. Dr. Meyers
23   planned to ask Debra Blaker to see plaintiff as it was out of Dr.
24   Meyers's area to treat for chronic pain management. Id. She
25   indicated she would see plaintiff in three months, or sooner if
26   needed. Id.

27   The next appointment plaintiff had with a physician was on
28   October 12, 2005, with Dr. Wendell Tollerton, in Astoria. Tr.

12 - FINDINGS & RECOMMENDATION

231.[2]  Dr. Tollerton noted plaintiff's history of diabetes and remarked on her self-report of "neuro" in feet.  Id.; Tr. 222.  He further noted her history of hypertension for which she takes Enalapril.  Id.  Next, he recorded her self-report of anxiety with nightmares for which she takes Klonopin.  Id.  He also remarked on her complaint of radiculopathy following a 2000 motor vehicle accident, with pain now moving from right shoulder to left knee, and radiculopathy in the left shoulder.  Id.

On physical examination, plaintiff was able to abduct her arms to 120 degrees to the right with a "9/10 dull pain."  Tr. 222.  She was able to forward flex her right shoulder to 120 degrees also. Id.  She had no impingement sign either on the right or left.  Id. Her gripping, flexing, and extension were 5/5 on the left side. Id.  The right side showed "subjective decrease in strength but scale of 5/5."  Id.

Dr. Tollerton assessed plaintiff as having diabetes with neuropathy, hypertension, c-spine radiculopathy, anxiety, and a

---

[2]  The record is a bit unclear about what date Dr. Tollerton actually first saw plaintiff.  His handwritten record bears the date of October 12, 2005.  Tr. 231.  This is confirmed by a separate record of medications prescribed by Dr. Tollerton which show four prescriptions ordered for plaintiff on that date.  Tr. 238, 240.  Typically, Dr. Tollerton's records have a handwritten "SOAP NOTE," for each visit, with a typewritten Progress Note repeating the information found on the handwritten page.  E.g.. Tr. 226 (handwritten SOAP NOTE for November 11, 205), and Tr. 224-25 (typed Progress Note for same visit).

The typed Progress Note which repeats the information found on Dr. Tollerton's handwritten October 12, 2005 SOAP NOTE, bears the date of November 12, 2005, rather than October 12, 2005.  Tr. 222-23.  I assume that this is an error, and the Progress Note dated November 12, 2005, is actually the Progress Note for the October 12, 2005 visit.

13 - FINDINGS & RECOMMENDATION

toothache.    Id.    He prescribed penicillin for the toothache, diabetes medications, Enalapril for her hypertension, and Klonopin. Tr. 22-23.   Although there is no remark in either the handwritten SOAP NOTE or the typed Progress Note from that October 12, 2005 visit, the medication record shows that he also prescribed methadone, forty milligrams, every eight hours.   Tr. 240.

Dr. Tollerton saw plaintiff again on October 27, 2005.   Tr. 229.   Dr. Tollerton noted that plaintiff stated that she walked two to three miles per day, even though he reported her as having neuropathy in her feet.   Tr. 229.   No other relevant changes were noted in her Progress Notes for that visit.   Id.

On November 11, 2005, Dr. Tollerton saw plaintiff again to follow up on her diabetes, hypertension, radiculopathy, and anxiety.   Tr. 224-25.   At this visit, plaintiff reported that she walked at least five miles per day.   Tr. 224.   Dr. Tollerton noted that she had pain in her shoulders and knee which was probably degenerative joint disease.   Id.   He stated that the radiculopathy was probably c-spine.   Id.   Dr. Tollerton noted that plaintiff does not eat a diet which was compatible with keeping her diabetes under control.   Id.   He asked her to get her eating cycle to agree with the times the kitchen at the shelter where plaintiff was currently staying, was open.   Id.   He refilled her methadone and Klonopin. Id.

Plaintiff apparently saw Dr. Tollerton again in late January 2006.   The exact date appears to be January 27, 2006, but it is unclear from Dr. Tollerton's handwritten SOAP NOTE and there is no corresponding typewritten Progress Note for the visit.   Tr. 221. No apparent changes in plaintiff's condition are noted.   Id.

14 - FINDINGS & RECOMMENDATION

Plaintiff continued to walk five miles per day and her hypertension continued to be well controlled. Id. She continued to complain of pain in her right shoulder, although her knees were reported to be "ok." Id. Dr. Tollerton noted plaintiff's complaint that she was not sleeping well. Id. He made some adjustments to her diabetes medications. Id.

Plaintiff did not keep her February 3, 2006 appointment with Dr. Tollerton. Tr. 220. The last record from his office is the medication list showing that he renewed prescriptions for insulin and Klonopin on March 6, 2006. Tr. 238.

On April 7, 2006, plaintiff was seen by Dr. Raymond Baculi, M.D., at the Salem Clinic. Tr. 242-43. Plaintiff reported having diabetes and hypertension. Id. Plaintiff also complained of an increased depressed mood. Tr. 242. Plaintiff told Dr. Baculi that in the past, she had been taking the antidepressant amitriptyline, but had not taken it in a number of years. Id. She was currently homeless. Id.

Dr. Baculi assessed plaintiff as having diabetes, hypertension, and depression. Tr. 243. He continued her on her current diabetes medications, continued her on her hypertension medication, and restarted her on amitriptyline. Id. He advised her to return in one month. Id. A May 2006 chart note indicates that plaintiff moved to Eugene and planned to transfer her care to a different doctor. Id.

There are no medical records from any practitioner between Dr. Baculi's April 7, 2006 visit, and a March 2007 report by psychologist David Northway, Ph.D., whom plaintiff saw for a neuropsychological consultation. Tr. 283-91. After missing her

15 - FINDINGS & RECOMMENDATION

1  first  appointment,  she  appeared  on-time  for  a  rescheduled
2  appointment on March 14, 2007, but was too tired and performed too
3  slowly to finish the assessment at that time.  Tr. 283.  She then
4  arrived an hour late to her next appointment on March 23, 2007.
5  Id.

6      Dr. Northway started his report by noting that plaintiff
7  appeared somewhat disjointed and rambling in her presentation and
8  responded very slowly both to formal questions and resting as well
9  as to interview.  Tr. 284.  He stated that "[h]er level of honesty
10 could not be clearly determined.   There was a slightly over-
11 dramatic sense to her presentation."  Id.

12     Plaintiff  reported  to  Dr.  Northway  that  she  never  used
13 methamphetamine willingly, but claimed that someone had given her
14 methamphetamine and told her it was Fen-Phen, a diet drug.  Tr.
15 285.  She denied any intravenous drug use, but admitted to trying
16 heroin approximately fifteen years earlier.  Id.  She reported that
17 she eventually lost her house as a result of her drug problems.
18 Id.  Although she told Dr. Northway that she last used marijuana
19 about six months earlier, Dr. Northway stated that it was difficult
20 to clearly follow her responses regarding her marijuana use.  Id.
21 She was hoping to get her current physician, a Dr. Bovee, to sign
22 a medical marijuana card for her, which she believed would help her
23 pain.  Id.  She told Dr. Northway that she intentionally went off
24 all her pain medications and benzodiazepines because she thought
25 that  would  help  her  obtain  disability  benefits  from  Social
26 Security.  Id.  She was using methadone for pain management.  Tr.
27 285, 289.  Plaintiff also told Dr. Northway that she had been
28 arrested for shoplifting food.  Tr. 285.

16 - FINDINGS & RECOMMENDATION

1    Plaintiff described her mood as "mostly depressed." Tr. 286.
2  She reported that she had had "multiple little attempts" when asked
3  about suicidal ideation.  Id.  She reported that November 2005 was
4  the last time she had tried to cut her wrists.  Id.  She told Dr.
5  Northway that she was taken to the emergency room, but was not kept
6  overnight.  Id.

7    Dr. Northway administered the following neuropsychological
8  tests: (1) Wechsler Adult Intelligence Scale, Third Edition; (2)
9  Wechsler Memory Scale, Third Edition; (3) Trail Making Test; (4)
10 Reitan-Indiana  Aphasia  Screening  Test;  and  (5)  Personality
11 Assessment Inventory.  Tr. 287-89.

12   In the discussion and impression section of his report, Dr.
13 Northway noted that the neuropsychological testing "was not
14 strongly suggestive of serious deficits except that she seems to
15 process visual spatial information quite slowly."  Tr. 289.  Her
16 scores on several tests were consistent with this.  Id.  Dr.
17 Northway noted that lack of mental efficiency could be correlated
18 with higher levels of depression, but otherwise, her cognitive
19 functions were relatively intact.  Id.  Intellectually, she was in
20 the average to low average range.  Id.  "From a cognitive
21 perspective, she might be expected to complete tasks more slowly
22 than her peers and it is unclear whether or not she could work
23 competitively if speed and efficiency are primary concerns of an
24 employer."  Id.

25   In this part of his report, Dr. Northway noted that plaintiff
26 seemed to be suffering from a number of Axis I and Axis II
27 problems, which would have an impact on her ability to interact
28 with others.  Id.  She demonstrated signs indicative of a

17 - FINDINGS & RECOMMENDATION

1  borderline personality disorder, with some anti-social features.
2  Id. Dr. Northway further noted that plaintiff seemed to have post-
3  traumatic stress disorder.  Tr. 289.  He did not articulate the
4  basis for this remark in this section of his report, but in his
5  discussion of the Personality Assessment Inventory test, Dr.
6  Northway remarked that there were aspects of plaintiff's profile
7  suggesting the presence of post-traumatic stress disorder
8  "symptomology." Tr. 288.  He does not further elaborate what those
9  aspects were.  Id.

10      In the discussion and impressions section, Dr. Northway
11  further noted that plaintiff seemed to have depression, although
12  again, he does not cite the source for that conclusion in that
13  section.  Tr. 289.  He also noted that she reported a history of
14  conflicts in relationship in various settings and would not be an
15  easy person to work with cooperatively or collaboratively.  Id.
16  Dr. Northway remarked that plaintiff could be volatile quite easily
17  and that her emotional lability was apparent even in the course of
18  his assessment.  Id.

19      Dr. Northway stated that plaintiff complained of a number of
20  physical problems and chronic pain, which he suggested be carefully
21  evaluated by an appropriate medical provider.  Id. He noted that
22  it was not clear if her diabetes was always carefully controlled.
23  Id.

24      In his Axis I diagnostic impressions, Dr. Northway listed (1)
25  dysthymic disorder, (2) rule out major depressive disorder,
26  recurrent, moderate, (3) pain disorder associated with general
27  medical condition and psychological factors, and (4) anxiety with
28  features of post-traumatic stress disorder and obsessive-compulsive

18 - FINDINGS & RECOMMENDATION

disorder.  Tr. 290.  In his Axis II diagnostic impression, he listed non-specific personality disorder with significant features of borderline, anti-social, and dependent personality disorders present.  Id.  Dr. Northway rated her Global Assessment of Functioning (GAF) score as 50.  Id.

Dr. Kurt Brewster, M.D. conducted an independent internal medicine examination of plaintiff on March 26, 2007.  Tr. 258-70. Dr. Brewster performed a thorough physical examination and medical record review.  Id.  He concluded first that plaintiff's diabetes was well documented in the chart and despite her statement to him that she had never been able to get the disease under control, the records showed that when she adhered to her insulin, she was able to manage it.  Tr. 269.  He noted, however, that her current homelessness had to be taken into account and that storage of diabetes medication may be difficult and affect her compliance. Id.

Next, he stated that on physical testing, plaintiff had preserved lower extremity vibration and light touch sense.  Id. There was an absence of sharp touch.  Id.

Dr. Brewster found plaintiff's complaints of chronic pain less clear.  Id.  Although she alleged that a 2000 motor vehicle accident left her with resultant neck pain requiring ongoing methadone use, there was no history of neck x-ray, MRI, or nerve conduction studies.  Id.  Thus, Dr. Brewster noted it was in "this area where discrepancies are noted."  Id.  Plaintiff took off her coat and abducted her arm to 170 degrees spontaneously, but on testing she showed marked limitation on abduction to 80 degrees. Id.  She also had no evidence of left forearm atrophy and motor

19 - FINDINGS & RECOMMENDATION

1  strength was preserved in all areas.  Id.  Dr. Brewster found that
2  the medical records had not established an objective basis for
3  plaintiff's neck pain.  Id.

4       Finally, as to her feet, he noted that there was a loss of
5  sharp touch sensation over the plantar surface of the feet in the
6  face of poorly controlled diabetes.  Id.  This may have been partly
7  attributable to her living situation.  Id.

8       In terms of her functional assessment, Dr. Brewster opined
9  that plaintiff could walk/stand for about six hours in an eight-
10 hour day, and had no sitting restrictions.  Id.  She needed
11 occasional restrictions on balancing, climbing, and crawling given
12 the loss of sharp sensation in her feet.  Tr. 270.  As for
13 environmental limitations, Dr. Brewster stated that because of her
14 loss of sharp touch sensation and her uncontrolled diabetes, she
15 was at "increased risk," and would have to avoid areas where she
16 would encounter trauma.  Id.

17      At about the time plaintiff was examined by Dr. Northway and
18 Dr. Brewster, she received a psychodiagnostic assessment by
19 psychologist Pamela Joffe, Ph.D.  Tr. 248-57.  Dr. Joffe met with
20 plaintiff on March 24, 2007, March 27, 2007, and April 3, 2007.
21 Tr. 248.

22      Dr. Joffe reviewed plaintiff's medical records and
23 administered the following tests: (1) Calculation subtest-Woodcock
24 Johnson III, Tests of Achievement; (2) the Information and
25 Orientation, and Mental Control subtests from the Wechsler Memory
26 Scale, Revised; (3) the Digit Span Subtest from the Wechsler Adult
27 Intelligence Scale, Third Edition; (4) the Beck Depression
28 Inventory-Second Edition; and (5) the Minnesota Multiphasic

20 - FINDINGS & RECOMMENDATION

Personality Inventory-Second Edition (MMPI-2).  Id.

Dr. Joffe noted that plaintiff was fatigued and somewhat irritable.  Tr. 251.  Plaintiff told Dr. Joffe that she had cut herself with a razor in 2004, and had since taken too many Klonopin at times, but was not currently suicidal.  Tr. 252.

Dr. Joffe's Axis I diagnostic impressions were (1) mood disorder (anxiety and depression) due to general medical condition (diabetes), (2) physical abuse as a child, and (3) nicotine dependence with a prior history of alcohol and methamphetamine use. Tr. 253.  She rated her GAF as 50.  Id.

Dr. Joffe noted that plaintiff was able to understand and remember instructions during the interview.  Tr. 254.  However, she noted that plaintiff's ability to understand and remember more complicated instructions would fluctuate depending upon how much sleep she had the night before, and her blood sugar.  Id.  Dr. Joffe further noted that interpersonally, plaintiff reported no current difficulties, but having been hurt in the past, she would tend to avoid contact with others.  Id.  She had adequate communication skills.  Id.

On April 18, 2007, plaintiff went to "Options" Counseling in Eugene, Oregon, and received an Adult Initial and Psychosocial Comprehensive Mental Health Assessment from Patti Bear, M.A.  Tr. 276-81.  The report states that plaintiff "came in crisis," complaining about being homeless, being unable to get refills of her pain medications, and being unable to stay at "the Mission" because of her use of syringes for insulin.  Tr. 276.  Although she reported that she would "rather put a bullet in my head than live like this," she also told Bear that she had a religious conflict

21 - FINDINGS & RECOMMENDATION

with these feelings and thinks it is wrong to take one's own life. Tr. 277.  She told Bear that she had tried to slit her wrists on November 19, 2005, when she was kicked out of a shelter in thirty degree weather.  Id.

Bear's Axis I diagnoses for plaintiff were (1) generalized anxiety disorder; (2) major depressive disorder, moderate; and (3) rule out attention deficit hyperactivity disorder.  Tr. 280.  She rated her current GAF as 30.  Id.  Bear recommended therapy and a medication consultation.  Tr. 281.  She was given an appointment with a psychiatric mental health nurse practitioner.  Id.  There are no records of plaintiff keeping such an appointment in the Administrative Record.

Plaintiff went to the emergency room at Sacred Heart Medical Center in Eugene on April 23, 2007, with a chief complaint of hyperglycemia.  Tr. 356.  She reported that her feet hurt because of diabetic neuropathy, and that her prescriptions were waiting for her in a pharmacy on "River Road," and she could not walk there to obtain them.  Id.  She was staying with a friend, but explained that before that, her medications and syringes had been stolen so she had not regularly been taking her insulin.  Id.  She was upset with Dr. Bovee, whom she described as her previous primary care practitioner.  Id.  She stated that he had not sent information to integrated health clinics so she had not been able to follow up with a new primary care physician.  Id.

The emergency department physician who saw plaintiff, Dr. Sarah Coleman, M.D., noted that plaintiff's social situation was very chaotic and this was contributing to her noncompliance.  Id. At the time of her examination, plaintiff was somewhat disheveled,

22 - FINDINGS & RECOMMENDATION

1  but did not appear to be in acute distress.  Id.

2      Plaintiff was given intravenous fluids and insulin while in
3  the emergency room.  Tr. 357.  Dr. Coleman reported that plaintiff
4  was doing much better once her blood sugars had come down.  Id.  A
5  friend had volunteered to go pick up plaintiff's prescriptions for
6  her.  Id.  Plaintiff requested Neurontin, used to treat nerve pain,
7  for her neuropathy.  Id.  Because there were no records about
8  whether she had tried this before, Dr. Coleman gave her a
9  prescription for a small amount.  Id.  She also gave her ten
10 Vicodin.  Id.  She encouraged plaintiff to follow through with a
11 new primary care physician.  Id.

12     On June 1, 2007, plaintiff saw John V. Allcott, M.D., of
13 Applegate Medical East, for care of her diabetes and treatment of
14 her neuropathy and depression.  Tr. 297.  Although there are
15 indications plaintiff saw Dr. Allcott on May 4, 2007, no chart note
16 from that visit appears in the Administrative Record.  See Tr. 302
17 (noting vital signs such as weight, height, body mass index, blood
18 pressure, and pulse, for May 4, 2007, June 1, 2007, and June 29,
19 2007); Tr. 297 (June 1, 2007 office visit chart note noting goals
20 were "same as one month ago"); Tr. 299 (noting pain goals from May
21 4, 2007).

22     On physical examination, plaintiff was neatly dressed, mildly
23 argumentative, and "exacting about her regimen."  Tr. 299.  Her
24 mood was listed as no depression, anxiety, or agitation.  Id.  Her
25 diabetic foot check showed dry and calloused feet.  Id.  Dr.
26 Allcott noted that there was no improvement yet in plaintiff's
27 peripheral neuropathy pain.  Id.

28     At the time of the June 1, 2007 visit, plaintiff was taking

23 - FINDINGS & RECOMMENDATION

1    Neurontin for peripheral neuropathy, and methadone for neuropathy.

2    Tr. 298.   She was also taking the antidepressant Effexor for

3    depression, and ibuprofen for back pain.   Id.

4        Dr. Allcott doubled plaintiff's methadone dose from one ten-

5    milligram tablet four times per day, to two ten-milligram tablets

6    four times per day, and noted that plaintiff should return in four

7    weeks to check her depression and pain relief.   Tr. 298-99.   He

8    suggested she may need to eventually increase her dose.   Id.

9        On June 9, 2007, plaintiff was treated at the emergency room

10   of Sacred Heart Medical Center, and then admitted to the hospital

11   until June 12, 2007.   Tr. 315-34, 347-55.   She was brought to the

12   emergency room by ambulance after being found on the street in an

13   altered mental status.   Tr. 351.   Id.   She was difficult to arouse

14   and mumbled incoherently.   Id.   The emergency room physician

15   believed that she had taken an overdose of methadone, and concluded

16   that plaintiff should be admitted to the hospital for further

17   observation, and to allow her mental status to clear enough for

18   plaintiff to be safe on the streets.   Tr. 352; see also Tr. 347

19   (noting her admission to hospital for suspected overdose of

20   methadone).

21       Plaintiff's discharge summary was written by Dr. Allcott.   Tr.

22   354-55.   He noted the high likelihood of polydrug interaction,

23   including, possibly, the over usage of prescribed methadone.   Tr.

24   354.   Dr. Allcott noted that plaintiff herself denied any abuse or

25   change in her methadone dosing.   Tr. 355.

26       On June 29, 2007, plaintiff saw Dr. Allcott at his office.

27   Tr. 293-95.   At the time, she was still taking Neurontin for

28   peripheral neuropathy, ibuprofen for back pain, methadone for pain,

24 - FINDINGS & RECOMMENDATION

1  and Effexor for depression, along with her diabetes medications.

2  Tr. 294.  At the visit, however, Dr. Allcott discontinued the

3  prescription for Effexor, and does not appear to have added a

4  substitute antidepressant, despite a notation that plaintiff had

5  requested Klonopin or the benzodiazepine Xanax.  Tr. 293-94.  Dr.

6  Allcott increased plaintiff's methadone dose from two ten-milligram

7  tablets four times per day, to one forty-milligram tablet three

8  times per day.  Tr. 294-95.  He recommended that she return in four

9  weeks, but there are no records of additional visits.

10  II.  Plaintiff's Testimony

11      Plaintiff testified at the February 2007 hearing that she had

12  adult-onset diabetes, hepatitis C, severe neuropathy in both of her

13  feet which was traveling up to her knees, and depression.  Tr. 394.

14  She stated that she attempted to take her life on November 19,

15  2005, and at other times which were not documented.  Id.

16      Plaintiff stated that she was in a car accident in 2000 when

17  she was knocked out.  Tr. 395.  However, she did not go to the

18  hospital because she did not know she was hurt at the time.  Tr.

19  406.  According to plaintiff, the accident caused a radicular

20  "thing" in her neck which has caused her pain since that time.  Tr.

21  395.  She described the pain as "horrible," including very tight

22  muscles and a constant sound of "bone on bone," like a grinding

23  sound.  Id.  Sometimes the pain radiates.  Tr. 395-96.  She gave an

24  example of it starting in her right shoulder and rotating to her

25  left hip.  Id.

26      Plaintiff stated that her depression is evident because she

27  "kind of just" doesn't care about things that used to interest her,

28  such as long walks or bike rides.  Tr. 397.  She complained about

25 - FINDINGS & RECOMMENDATION

her teeth, noting that she had maybe seven teeth left.  Tr. 398.

Plaintiff described her sleeping habits as "really bad."  Id.
She noted that one year earlier, she decided to stop taking all
medications except insulin and blood pressure drugs because she did
not want "anybody to ever be able to say that this was about
drugs."  Id.  She admitted that in doing this, she did herself no
favors.  Id.  She does not take naps.  Id.  Plaintiff's eating
habits are "really bad," primarily because of her living and dental
situations.  Tr. 399.

Plaintiff stated that she would work if she could, but she was
plagued by neuropathy, or alternatively, depression, which
prevented her from working.  Tr. 400-01.  Because of her
homelessness, plaintiff had a hard time describing her typical
daily activities.  Tr. 402-03.  She said it depends on the day.
Tr. 403.  She was currently staying at someone's house, but she
still experienced problems with staying clean and "together" such
that she could look for a job.  Id.

Plaintiff testified that she could stand for twenty or thirty
minutes before needing to sit.  Tr. 404.  When asked how long she
could walk without sitting down, plaintiff said it depends on the
day, because "the day determines the neuropathy[.]"  Id.  She
indicated that she did a lot of walking "out there," suggesting
that sometimes she had no choice, even if it meant covering ten
miles over the course of several hours and broken up by "other
stuff[.]"  Tr. 404-05.

Plaintiff guessed that the most she could lift was ten pounds,
with the limitation caused by the "radicular thing," and problems
with her shoulder, back, and neck.  Tr. 417.  She indicated that

26 - FINDINGS & RECOMMENDATION

1  she could lift a bag of groceries, and could probably carry a
2  couple of gallons of milk, but not far.  Tr. 418.  Plaintiff also
3  indicated that the neuropathy would prevent her from standing in a
4  job such as waitressing.  Tr. 421.

5      At the second hearing in September 2007, the ALJ asked
6  plaintiff about the June 2007 Sacred Heart Hospital record noting
7  that plaintiff had recently lost a position as a caregiver.  Tr.
8  445.  In response, plaintiff explained that in exchange for a "roof
9  over my head[,]" she helped take care of a man who was severely
10  manic depressive by making sure the house was clean and by cooking
11  meals for him.  Tr. 445.

12  III.  Vocational Expert Testimony

13      Vocational Expert (VE) Kathleen O'Gieblyn testified at the
14  February 2007 hearing.  Tr. 429.  The ALJ posed several
15  hypotheticals to her, and plaintiff's counsel added limitations as
16  well.  Tr. 432-38.  At the conclusion of the February 2007 hearing,
17  the ALJ ordered that plaintiff receive consultative examinations.
18  Tr. Tr. 438-40.

19      At the September 2007 hearing, the ALJ indicated that after
20  considering the information from the consultative examinations, the
21  earlier VE testimony provided by Ms. O'Gieblyn was in response to
22  a hypothetical the ALJ now considered inappropriate.  Tr. 446.
23  Thus, he called a new VE expert, C. Kay Wise, as a witness at the
24  September 2007 hearing.  Id.

25      The ALJ presented the following hypothetical to the VE:
26  someone of plaintiff's age, with one year of college, and with the
27  same prior work as plaintiff.  Tr. 448.  The person would have the
28  ability to stand or walk six hours in an eight-hour period, and had

27 - FINDINGS & RECOMMENDATION

no limitations in sitting or lifting.  Id.  The person needed to avoid dangerous hazards where there would be a risk of trauma.  Id. The person would be limited to occasional ramp negotiation and stair climbing, ladder climbing and scaffold use, and crouching. Id.  The person would be unable to understand, remember, and carry out detailed instructions, and would be intolerant of changes in the work setting.  Id.  The person would need a predictable stable routine, with little variation and simple tasks.  Id.  The person might have difficulty being consistent in her manner of relating with co-workers or the public, however, the person would still be capable of routine, superficial, or occasional interaction that does not require ongoing need for cooperative or collaborative teamwork interaction.  Tr. 448-49.  Finally, the person might also be unable to maintain a rapid pace or tasks where efficiency is a primary concern.  Tr. 449.

In response, the VE testified that plaintiff could not perform her past relevant work as a legal secretary.  Id.  The ALJ asked if the VE could identify other work that would be appropriate at the medium level of exertion.  Tr. 450.  In response, the VE identified several jobs, including hand packager, library shelver, office helper, and addresser.  Tr. 450-57.

THE ALJ'S DECISION

The ALJ first determined that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2006.  Tr. 23.  He found that she did not engage in substantial gainful activity during the period from her alleged onset date of October 31, 2001, through the December 31, 2006 last insured date. Id.

28 - FINDINGS & RECOMMENDATION

1

    Next, the ALJ determined that plaintiff

2
3
4
5
6
7

    had the following severe combination of impairments:
    insulin-dependent (currently) diabetes mellitus with
    neuropathy, hepatitis C with normal albumin and normal
    bilirubin, . . . a dysthymic disorder, a pain disorder
    with psychological and medical factors, an anxiety
    disorder, a personality disorder with
    borderline/antisocial/dependent features, a history of
    substance abuse/dependence (methamphetamine, marijuana),
    a history of seizures with none for an extended period,
    and a history of reported cervical spine radiculopathy[.]

Tr. 24.

8
9
10

    However, the ALJ further found that plaintiff did not have an

impairment or combination of impairments that met or equaled a

listed impairment.  Tr. 27.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    The ALJ next determined plaintiff's residual functional

capacity (RFC).  Tr. 28-32.  The ALJ found that plaintiff could

stand/walk for six hours in an eight-hour day, and had no limits on

sitting or lifting.  Tr. 28.  He did find, however, that she could

only occasionally crouch, climb ladders, ropes, or scaffolds, or

climb ramps and stairs.  Id.  He found several non-exertional

limitations, including avoiding dangerous hazards where there was

a risk of trauma, an inability to understand, remember, or carry

out detailed instructions, an intolerance of changes in the work

setting, and the need for a predictable, stable, routine with

little variation in performing simple tasks.  Id.  He also found

that she might have difficulty being consistent in her manner of

relations with co-workers or the public, but that she nonetheless

was capable of routine, superficial, or occasional interactions

that would not require an ongoing need for cooperative or

collaborative teamwork interaction.  Id.  Finally, he found that

she was unable to maintain a rapid pace or perform tasks where

29 - FINDINGS & RECOMMENDATION

1  efficiency was a prime concern.  Id.

2      In reaching this RFC, as discussed more thoroughly below, the
3  ALJ rejected much of plaintiff's subjective limitations testimony.
4  Tr. 28-32.  He further noted that because plaintiff's insured
5  status expired at the end of 2006, any limitations noted in 2007
6  were relevant only if they could be demonstrated to have been in
7  place in 2006.  Tr. 32.

8      Based on his RFC, the ALJ determined that plaintiff could not
9  return to her prior relevant work as a legal assistant.  Tr. 32.
10 Relying on the testimony of the VE, he determined, however, that
11 there were jobs that existed in the significant numbers in the
12 national economy that plaintiff could have performed, including
13 hand packager, library shelver, office helper, and addresser.  Tr.
14 32-33.  Accordingly, the ALJ found plaintiff not disabled within
15 the meaning of the Social Security Act.  Tr. 33-34.

16            STANDARD OF REVIEW & SEQUENTIAL EVALUATION

17     A claimant is disabled if unable to "engage in any substantial
18 gainful activity by reason of any medically determinable physical
19 or mental impairment which . . . has lasted or can be expected to
20 last for a continuous period of not less than 12 months[.]"  42
21 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according
22 to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395
23 (9th Cir. 1991).  The claimant bears the burden of proving
24 disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
25 1989).  First, the Commissioner determines whether a claimant is
26 engaged in "substantial gainful activity."  If so, the claimant is
27 not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
28 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

30 - FINDINGS & RECOMMENDATION

determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla," but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

31 - FINDINGS & RECOMMENDATION

1                                  DISCUSSION

2       Plaintiff contends that the ALJ erred by (1) failing to find

3   that her depression is a severe impairment; (2) failing to find

4   that her depression meets or equals a listed impairment; (3)

5   rejecting her subjective testimony; and (4) failing to consider her

6   combined impairments, and failing to consider her inability to

7   sustain work performance, in making the RFC determination and as a

8   result, failing to present a proper hypothetical to the VE.  I

9   address the arguments in turn.

10  I.  Depression as a Severe Impairment

11      Although plaintiff alleges an onset date of October 31, 2001,

12  there are no medical records before October 31, 2003.  The first

13  mention of depression in the record is plaintiff's self-report to

14  Dr. Laurie on April 12, 2004.  Tr. 167.  Dr. Laurie noted her

15  depression in the assessment and plan section of his progress note,

16  but indicated that plaintiff wanted only her methadone.  Tr. 168.

17  There is no mention in his progress note from this date of any

18  functional limitations attributable to her report of depression.

19  Tr. 167-68.  Dr. Laurie expressly stated that she was not suicidal.

20  Tr. 167.  Notably, at her next, and last, visit with Dr. Laurie on

21  May 12, 2004, there was no mention of plaintiff's depression at

22  all, either by plaintiff or by Dr. Laurie in any section of his

23  progress note.  Tr. 165-66.

24      The next mention of depression is in Dr. Baculi's April 7,

25  2006 chart note, the record of plaintiff's only visit with Dr.

26  Baculi.  Tr. 242-43.  Plaintiff complained of an increased

27  depressed mood, and reported having previously taken amitriptyline,

28  but not in a number of years.  Tr. 242.  Dr. Baculi noted

32 - FINDINGS & RECOMMENDATION

"[p]ositive for depressed mood" in his "review of systems," but no specific information is provided regarding the basis for this statement and no limitations on plaintiff's functioning as a result of depression are noted. He prescribed amitriptyline for her. Tr. 243.

The issue of depression does not appear in the medical records again until plaintiff's consultative examination with Dr. Northway in March 2007, a date past her last insured date of December 31, 2006. Tr. 286. At the time, she described her mood as "mostly depressed." Id. Nonetheless, even though Dr. Northway had mentioned depression in his narrative, his primary Axis I diagnostic impression was dysthymic disorder. Tr. 290. He listed major depressive disorder, recurrent, moderate, only as a "rule-out" diagnosis. Id.[3]

In April 2007, also a date past her date last insured, Dr. Joffe assessed plaintiff not with major depression, but with a mood disorder due to a general medical condition. Tr. 253. Although Dr. Joffe suggested that the mood disorder was associated with both anxiety and depression, she did not assess plaintiff with major depressive order as outlined in the DSM IV-TR. Tr. 253 (Dr. Joffe's citation to DSM IV-TR diagnosis code of 298.83 for mood

---

[3] The Diagnostic & Statistical Manual of Mental Disorders explains that differentiating between dysthymic disorder and major depressive disorder is difficult. American Psychiatric Association, Diagnostic & Statistical Manaul of Mental Disorders 379 (4th ed. Text Revision 2000) (DSM IV-TR). As noted there, however, major depressive disorder usually consists of one or more discrete major depressive episodes that can be distinguished from the person's usual functioning whereas dysthymic disorder is characterized by chronic, less severe symptoms that have been present for many years. Id.

1  disorder due to a medical condition); DSM IV-TR at pp. 401-05
2  (outlining diagnostic criteria for diagnosis of mood disorder due
3  to a medical condition, with code number 298.83); see also Id. at
4  p 376 (outlining diagnostic criteria for major depressive disorder,
5  recurrent, bearing code number 296).

6      Later in April 2007, plaintiff was assessed by Patti Bear at
7  Options Counseling, as having moderate major depressive disorder.
8  Tr. 280.  The DSM IV-TR code she used in defining the disorder,
9  296.22, indicates her diagnosis was for a single episode, not
10 recurrent.  See DSM IV-TR at p. 370 (which explains that in
11 recording the diagnosis, the first three digits are 296, and the
12 fourth digit is either "2" for a single major depressive episode,
13 or "3" for recurrent major depressive episodes).

14     In June 2007, plaintiff saw Dr. Allcott.  Tr. 298.  Although
15 he noted her depression, the DSM IV-TR code he used was not for
16 major depressive disorder, but was number 300.4, the code for
17 dysthymic disorder.  DSM IV-TR at p. 376.

18     The ALJ reviewed the August 23, 2004 assessment by non-
19 examining psychologist Paul Rethinger Ph.D.  Tr. 26.  The ALJ
20 adopted Dr. Rethinger's conclusions that as of that time, plaintiff
21 had nonsevere psychological impairments in the form of an anxiety
22 disorder and a substance abuse disorder (methadone maintenance
23 therapy and methamphetamine use), and that her psychological
24 impairments created no restrictions in daily living, and only mild
25 difficulties in maintaining social functioning, mild difficulties
26 in maintaining concentration/persistence/pace, and no episodes of
27 decompensation.  Id.

28     The ALJ also relied on the February 28, 2005 assessment of the
34 - FINDINGS & RECOMMENDATION

evidence by non-examining psychologist Robert Henry, Ph.D.   <u>Id.</u>
Like Dr. Rethinger, Dr. Henry noted that there was insufficient
evidence of any mental health problem until late October 2003 (Dr.
Rethinger) or early 2004 (Dr. Henry).   <u>Id.</u>   Dr. Henry noted the
lack of history of severe depression or anxiety issues, no mental
hospitalizations, no concerns noted by a treating source, although
plaintiff had reported a history of mental confusion.   <u>Id.</u>   He
further noted that plaintiff was independent with her activities,
drove, went for walks, watched television, and arranged dried
flowers as a hobby.   Tr. 26-27.

The ALJ also relied on Dr. Northway's March 2007 consultative
examination.   Tr. 27.   He noted Dr. Northway's conclusions,
including his diagnosis of dysthymic disorder.   Tr. 27.

Based on these reports, the ALJ included the following mental-
health related impairments in his list of "severe combination of
impairments" at step two:  dysthymic disorder, pain disorder with
psychological and medical factors, anxiety disorder, and a
personality disorder with borderline/antisocial/dependent features.
Tr. 25.

Plaintiff argues that the ALJ erred in failing to acknowledge
her depression as a severe impairment.   Pltf's Mem. at p. 3.   A
severe impairment is one that significantly limits the claimant's
physical or mental ability to do basic work activities.   20 C.F.R.
§§ 404.1520(c).   "Basic work activities" are the abilities and
aptitudes necessary to do most jobs, including physical functions
such as walking, standing, sitting, lifting, etc..   20 C.F.R. §§
404.1521(b).   In Social Security Ruling (SSR) 96-3p (available at
1996 WL 374181, at *1), the Commissioner has explained that "an

35 - FINDINGS & RECOMMENDATION

1  impairment(s) that is 'not severe' must be a slight abnormality (or
2  a combination of slight abnormalities) that has no more than a
3  minimal effect on the ability to do basic work activities."

4      The Ninth Circuit has explained that the step two severity
5  determination is expressed "in terms of what is 'not severe.'"
6  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ is
7  required to consider the claimant's subjective symptoms, such as
8  pain or fatigue, in determining severity. Id. Importantly, as the
9  Ninth Circuit noted, "the step-two inquiry is a de minimis
10  screening device to dispose of groundless claims." Id. (citing
11  Yuckert, 482 U.S. at 153-54).

12      Here, the ALJ did conclude that plaintiff had a severe
13  combination of impairments, including dysthymic disorder and other
14  psychological conditions. This is not a case where the non-
15  disability decision was made at step two. The ALJ went beyond step
16  two.

17      The evidence of plaintiff suffering from depression as a
18  separate, severe impairment before December 31, 2006, her last
19  insured date, is minimal. There are two self-reports: one to Dr.
20  Laurie in April 2004, and one to Dr. Baculi, two years later in
21  April 2006. There is no objective evidence of depression from her
22  alleged onset date of October 31, 2001, to her last insured date of
23  December 31, 2006. There is no evidence that she suffered any
24  limitations as a result of depression prior to that last insured
25  date.

26      Moreover, the evidence after December 31, 2006, is not
27  supportive of depression being a severe impairment before that
28  date. Dr. Northway's primary Axis I diagnosis was dysthymic

36 - FINDINGS & RECOMMENDATION

disorder.  Dr. Joffe's primary Axis I diagnosis was mood disorder based on an underlying medical condition.  Dr. Allcott listed depression, but coded the diagnosis for dysthymic disorder.  Bear also listed depression on April 18, 2007, but coded it as a single episode, not recurring, and thus, not relevant to the time period before plaintiff's last insured date.

Although the severe impairment analysis at step two is a screening device, the ALJ did not err in this case when he failed to list depression as a severe impairment.  The evidence in the record does not establish that depression limited, much less significantly limited, plaintiff's mental ability to do basic work activities before December 31, 2006.

Alternatively, even if the ALJ erred, it was not prejudicial to plaintiff because the ALJ listed dysthymic disorder as a severe impairment and then incorporated all relevant limitations into his RFC.  The DSM IV-TR describes the essential feature of dysthymic disorder as "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  DSM IV-TR at p. 376.  During the periods of depressed mood, at least two of the following symptoms must be present:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.  Id.  Dysthymic disorder shares similar symptoms with major depressive disorder, but usually, major depressive disorder "consists of one or more discrete Major Depressive Episodes that can be distinguished from the person's usual functioning, whereas Dysthymic Disorder is characterized by chronic, less severe depressive symptoms that have been present for many years."  Id. at

p. 379.  Here, by finding that plaintiff's dysthymic disorder was
a severe impairment, the ALJ recognized plaintiff's depressive mood
as a severe impairment.  This was sufficient based on the record.

Even assuming the ALJ should have considered plaintiff's
depression, instead of her dysthymic disorder, as one of the severe
impairments, such error was harmless.  Lewis v. Astrue, 498 F.3d
909, 911 (9th Cir. 2007) (any error by ALJ in neglecting to list
claimant's bursitis as a step two severe impairment was harmless
when the ALJ considered the limitations caused by the impairment in
assessing the claimant's RFC at step four).  Here, as discussed
further below, the ALJ's RFC incorporated several limitations
attributable to plaintiff's psychological conditions, including (1)
an inability to understand, remember, or carry out detailed
instructions; (2) an intolerance of changes in the work setting;
(3) a need for predictable, stable, routine with little variation
in performing simple tasks; (4) difficulty being consistent in her
manner of relations with co-workers or the public; (5) only
occasional interactions with others that would not require an
ongoing need for cooperative or collaborative teamwork interaction;
and (6) an inability to maintain a rapid pace or perform tasks
where efficiency was a prime concern.  These RFC limitations
sufficiently address any limitations supported in the record which
are attributable to plaintiff's alleged depression.

II.   Meet or Equal a Listed Impairment

Plaintiff argues that the ALJ erred by failing to find that
her impairments met or equaled Listing 12.04, the listing for
affective disorders.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

The ALJ found that plaintiff's mental impairments, considered

singly, or in combination, did not meet or medically equal the criteria for Listings 12.04, 12.06, 12.07, 12.08, or 12.09.  Tr. 27.  The ALJ explained that plaintiff did not meet the Paragraph B or Paragraph C criteria required for the listings.

Listing 12.04 provides, in pertinent part:

*Affective Disorders*:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
     The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

* * *

AND

B.  Resulting in at least two of the following:
     1.  Marked restriction of activities of daily living; or
     2.  Marked difficulties in maintaining social functioning; or
     3.  Marked difficulties in maintaining concentration, persistence, or pace; or
     4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

     1.  Repeated episodes of decompensation, each of extended duration;
     2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
     3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

39 - FINDINGS & RECOMMENDATION

1  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

2      The ALJ concluded that plaintiff had moderate restrictions in
3  activities of daily living, and moderate difficulties in social
4  functioning and in maintaining concentration, persistence, or pace.
5  Tr. 27. He further concluded that she had experienced only one or
6  two episodes of decompensation. Id. He concluded that because she
7  did not have at least two marked limitations, or one marked
8  limitation with repeated episodes of decompensation, the Paragraph
9  B criteria were not met. Tr. 27-28. He further concluded that the
10  Paragraph C criteria were also not met. Tr. 28.

11      Plaintiff argues that the record shows that she has marked
12  restrictions of activities of daily living, marked difficulties in
13  maintaining social functioning, marked difficulties in maintaining
14  concentration, persistence, or pace, and probable repeated episodes
15  of decompensation. Pltf's Mem. at p. 16. She contends that these
16  marked limitations are caused by the "presence of depressive
17  syndrome characterized by anhedonia/pervasive loss of interest in
18  almost all activities, sleep disturbance, decreased energy,
19  feelings of worthlessness, difficulty concentrating or thinking,
20  [and] thoughts of suicide." Id.

21      In support of this argument, plaintiff cites to only two
22  reports which pre-date her last insurance date. One is her
23  husband's July 18, 2004 report in which he states that plaintiff
24  "talks about death all the time[.]" Tr. 117. The other is
25  plaintiff's "Disability Report-Appeal" dated October 18, 2004. Tr.
26  121-27. In that report, plaintiff relies on her statement that she
27  was "becoming more and more depressed," and that she had given up
28  her nightly walks because she was "apathetic about the illness

40 - FINDINGS & RECOMMENDATION

because life itself is too difficult." Tr. 121, 125.

Even disregarding the ALJ's rejection of plaintiff's subjective testimony, discussed below, none of these three statements establish a marked limitation in any of the relevant "B" criteria. They also do not establish repeated episodes of decompensation, and they fail to establish any of the "C" criteria.

The rest of the medical record evidence cited by plaintiff in support of this step three argument, is from after her last insurance date of December 31, 2006. She relies on her subjective statements to Dr. Joffe in late March and early April 2007, in which, in response to a question about how she feels most of the time, plaintiff wept and said she felt like "shit." Tr. 251. She also told Dr. Joffe that she cut herself with a razor in 2004, causing her to be kicked out of a shelter.  Tr. 252.

Plaintiff notes that Dr. Joffe stated that under stress, plaintiff's behavior would be expected to deteriorate and that people with her profile are often anxious and experience sleep disturbance, difficulty concentrating, confused thinking, and forgetfulness.  Tr. 253.  Dr. Joffe also explained, in the narrative portion of her report, that plaintiff's ability to understand and remember complicated instructions would fluctuate depending on how much sleep she had the night before and her blood sugars.  Tr. 254.

Plaintiff relies on other statements she made to Dr. Northway and Bear, also in March and April 2007, as well as her statements at her February 2007 hearing that she had attempted to take her own life and just wanted to sleep constantly.  However, as explained below, the ALJ justifiably found plaintiff not credible.  As a

41 - FINDINGS & RECOMMENDATION

result, her subjective complaints to mental health practitioners do not establish the marked limitations required for a listed impairment.

Dr. Joffe completed an assessment of plaintiff's ability to do work-related activities. Tr. 255-57. She indicated that plaintiff's ability to understand and remember detailed instructions, and her ability to carry out detailed instructions, was moderate or marked, depending on plaintiff's blood sugar. Tr. 255. She wrote that plaintiff was able to understand the instructions for the MMPI-2, for example, but took four hours to complete it. Id. She explained that it appeared that plaintiff's ability to understand, remember, and carry out instructions was affected by her fatigue and blood sugar fluctuations. Id.

Dr. Joffe also indicated that plaintiff had a marked impairment in responding appropriately to work pressures in a usual work setting. Tr. 256. But, she explained that if plaintiff's blood sugar was well maintained, she would have fewer difficulties with social interaction. Id. If her blood sugars were not well maintained, or if plaintiff were under pressure, she would have difficulty performing appropriately. Id.

The ALJ noted that plaintiff's fatigue, was not, on the record before him, attributable to a medical condition, but to her living situation. Tr. 32. He noted that plaintiff explained her fatigue to Dr. Northway as being the result of homelessness for several days and being out of medication, and later, as a result of having been out until 4:00 a.m. looking for her husband. Id. He also noted that plaintiff's report to Dr. Joffe was that she had slept outside the prior night and thus, did not get to sleep until 3:30

42 - FINDINGS & RECOMMENDATION

1  a.m., and was awakened at 6:30 a.m.  <u>Id.</u>

2      To the extent Dr. Joffe's "marked" assessments were based on

3  plaintiff's fatigue, they are not supportive of a physically- or

4  mentally-based  limitation.   Additionally,  Dr.  Joffe's  "marked"

5  assessments do not establish the "B" criteria.  Those criteria

6  require marked restrictions in two of the following abilities:  (1)

7  activities of daily living; (2) maintaining social functioning; or

8  (3) maintaining concentration, persistence, or pace.  Dr. Joffe's

9  moderate  to  marked  limitations  are  in  the  abilities  to  (1)

10  understand  and  carry  out  detailed  instructions;  and  (2)  respond

11  appropriately to pressure in a work setting.  These are not the "B"

12  criteria.

13      Finally, as the ALJ noted, because plaintiff's insured status

14  expired at the end of 2006, any limitations noted in 2007 were

15  relevant only if they could be demonstrated to have been in place

16  in 2006.  Tr. 32.

17      The  ALJ's  determination  at  step  three  is  supported  by

18  substantial  evidence  in  the  record.   The  evidence  cited  by

19  plaintiff as establishing the required criteria for Listing 12.04

20  is either properly discredited subjective testimony, unsupportive

21  of the relevant criteria, or a post-last insured date assessment of

22  her functions.

23  III.  Plaintiff's Credibility

24      The ALJ found plaintiff's subjective testimony not credible.

25  The ALJ is responsible for determining credibility.  <u>Andrews v.</u>

26  <u>Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  Once a claimant shows

27  an  underlying  impairment  and  a  causal  relationship  between  the

28  impairment and some level of symptoms, clear and convincing reasons

43 - FINDINGS & RECOMMENDATION

1  are needed to reject a claimant's testimony if there is no evidence

2  of malingering.  Smolen, 80 F.3d at 1281-82.

3      When determining the credibility of a plaintiff's complaints

4  of pain, the ALJ may properly consider several factors, including

5  the plaintiff's daily activities, inconsistencies in testimony,

6  effectiveness or adverse side effects of any pain medication, and

7  relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750

8  (9th Cir. 1995).  The ALJ may also consider the ability to perform

9  household chores, the lack of any side effects from prescribed

10 medications, and the unexplained absence of treatment for excessive

11 pain when determining whether a claimant's complaints of pain are

12 exaggerated.  Id.

13     The ALJ discussed several bases upon which to discredit

14 plaintiff's testimony.  First, he discussed the evidence related to

15 the alleged car accident that plaintiff cited as the cause of her

16 disabling radiculopathy.  Tr. 29.  The ALJ noted plaintiff's

17 statement that she did not realize at the time of the accident that

18 she was hurt, and thus did not seek prompt medical attention.  Id.

19 The ALJ then noted plaintiff's testimony describing the accident as

20 one in which her head went forward and hit the windshield, then she

21 fell back in her seat and her head flopped around like a rag doll,

22 and she was knocked out.  Id.  The ALJ stated that plaintiff's

23 description of the accident was inconsistent with her statement

24 that she did not realize she was hurt.  Id.

25     The ALJ then cited to plaintiff's testimony that her then-

26 primary care practitioner Dr. Reeves, told her she had

27 radiculopathy.  But, as the ALJ had already noted in his opinion,

28 a request for plaintiff's records from October 1, 1999, to the

1    present, was sent to Dr. Reeves's office on July 23, 2004.  Tr. 26
2    n.1.  It was returned and annotated "No Records Available" for the
3    time period identified.  Id.; Tr. 172.

4        The ALJ also rejected plaintiff's testimony about her severity
5    of her radiculopathy pain because, although she has problems
6    comfortably lifting heavy items, she testified that she can lift a
7    bag of groceries or carry a couple of gallons a milk for a short
8    distance.  Tr. 29.  He further noted that there was a lack of
9    objective findings from tests such as nerve conduction studies, x-
10   rays, or MRIs, that would provide substantial support for her
11   alleged physical impairments.  Tr. 31.

12       Next, the ALJ noted the lack of any medical record of her
13   alleged suicide attempt which, at the February 2007 hearing,
14   plaintiff testified occurred on November 19, 2005.  Tr. 30.[4]  At
15   the time, plaintiff was under the care of Dr. Tollerton, and there
16   is no mention of any suicide attempt in his chart notes, nor is
17   there any hospital record affirming such an attempt.

18       The ALJ then discussed plaintiff's voluntary cessation of
19   medications which she testified thought would help her obtain
20   disability benefits.  Tr. 31.  Plaintiff's decision in this regard
21   was especially revealing to the ALJ.  He noted that first, it
22   raised the issue of unacceptable medical noncompliance with
23   prescribed treatment that would reasonably improve her
24   symptomatology and functioning.  Tr. 31.  He further noted that it

25

26   ─────────────────────

27       [4]  Plaintiff told Dr. Joffe that this occurred in 2004, not
     2005.  Tr. 252.  In November 2004, plaintiff was under the care
28   of Dr. Meyers and the chart notes reveal nothing about a suicide
     attempt.

45 - FINDINGS & RECOMMENDATION

would also "make it inherently probable that medical opinions about the nature/severity of the claimant's impairments will not accurately portray the claimant's true capabilities. Id. He concluded that "otherwise valid objective psychological testing . . . must be given reduced weight since the claimant has handicapped herself through noncompliance with medications." Id. The noncompliance suggests that "the claimant was not so limited as to see the need to aggressively pursue remedies." Id.

Next, the ALJ determined that plaintiff's history of polysubstance abuse suggested "patterns of duplicity/evasion/misdirection." Id. He then noted that discrepancies had been found in physical examinations. Id. He cited to Dr. Brewster's observation of plaintiff spontaneously abducting her arm to 170 degrees while hanging up her coat, but her statement during the actual exam by Dr. Brewster that she could not abduct it more than 80 degrees. Id. Finally, the ALJ noted that plaintiff reported that she had been fired in the past, for stealing, and that she acknowledged that she was jailed for eight days for stealing food in 2004. Id.

The ALJ then concluded that "[b]ased on this combination of factors, the claimant's statements concerning her impairments and their impact on her ability to work are accepted only to the extent that they are consistent with the residual functional capacity assessment arrived at above." Id.

Plaintiff contends that the ALJ erred by relying on plaintiff's alleged noncompliance with her medications. With no citation to any particular medical record, plaintiff argues that the record establishes that she continues to be ill and

46 - FINDINGS & RECOMMENDATION

significantly impaired even when taking her prescribed medications. She also argues that the record shows that her noncompliance was related to her financial circumstances, the medications being stolen, or her belief that they made her worse. Tr. 263 (reporting to Dr. Brewster that she could not afford her oral diabetes medication and was on and off of it); Tr. 279 (reporting that her medications had been stolen); Tr. 167 (reporting that she did not want to take antidepressants because they made her depression worse); see also Tr. 269 (Dr. Brewster noting that plaintiff's homelessness might make storage of medication difficult and affect compliance).

The record supports the ALJ.  First, the ALJ cited plaintiff's willful noncompliance as the basis for discrediting her testimony, not the times when she was unable to obtain medications because of financial problems or other reasons beyond her control.   Tr. 31 (discussing the "claimant's reporting that she had intentionally discontinued medications, as she felt this would be helpful in her attempt to get Social Security benefits").

Second, Dr. Calder's chart notes indicate that when plaintiff understood her disease and complied with medications, her diabetes became more controlled.   E.g., Tr. 190-91, 193, 196-96, 197-200; see also Tr. 269 (Dr. Brewster stating that the records showed that when plaintiff adhered to her insulin, she was able to manage her diabetes).  And, despite her statement to Dr. Laurie that she did not take antidepressants because they made her more depressed, she obtained a prescription for amitriptyline from Dr. Baculi in April 2006, and took Effexor prescribed by Dr. Allcott, suggesting that she believed the antidepressant drugs helped her.  Tr. 242-43, 298.

47 - FINDINGS & RECOMMENDATION

1    Thus, the record supports the ALJ's determination that the absence

2    of medication did affect plaintiff's impairments.

3         Plaintiff next argues that the ALJ's reference to plaintiff's

4    possible methamphetamine use was prejudicial to any assessment of

5    her condition and interfered with an accurate assessment of her

6    impairments.    The ALJ discussed some of the evidence regarding

7    plaintiff's history of drug use.  Tr. 31.  Specifically, he noted

8    that plaintiff testified that she was not using methamphetamine,

9    but rather, had taken what she had been told was a weight loss/diet

10   pill.  Tr. 30.  The ALJ further noted that plaintiff was told she

11   was taking an amphetamine after she had her blood checked.  <u>Id.</u>

12   The ALJ then remarked that plaintiff told Dr. Northway that she

13   never "willingly used methamphetamine" but had taken what she

14   thought was a weight loss drug.  <u>Id.</u>  The ALJ noted that plaintiff

15   had reported to Dr. Northway that she had tried a number of street

16   drugs in the past, had tried heroin many years previously, and had

17   become addicted to narcotics in the early 1980s.  <u>Id.</u>  Finally,

18   regarding her drug history, the ALJ stated that plaintiff had

19   stated that her last use of marijuana was six months previously,

20   but she was hoping to get her current physician to sign a medical

21   marijuana card so she could use it to help with her pain.  <u>Id.</u>

22       Thereafter, the ALJ concluded that plaintiff's history of

23   polysubstance    abuse    suggested    a    pattern    of

24   "duplicity/evasion/misdirection." Tr. 31.  The way I interpret the

25   ALJ's opinion is that he (1) concluded that her drug history alone

26   made her not credible, or, (2) found her testimony inconsistent and

27   thus, supportive of his finding that her drug abuse suggested a

28   pattern of duplicity, evasion, and misdirection.

48 - FINDINGS & RECOMMENDATION

1    I agree with plaintiff that the ALJ's finding which correlated
2  plaintiff's polysubstance abuse to a pattern of duplicity, etc., is
3  not entirely supported by the record.    In response to a question
4  from the ALJ inquiring if it was correct that she was using
5  methamphetamine at one point, plaintiff testified at the February
6  2007 hearing that she did not knowingly take methamphetamine, but
7  instead, took what she thought was a diet pill.    Tr. 409-10.
8  Despite losing a fair amount of weight, plaintiff was surprised to
9  learn, when her blood was checked, that she had been taking an
10  amphetamine.    Tr. 412.

11    While the explanation may have been difficult for the ALJ to
12  believe, her testimony on this issue is not inconsistent with other
13  parts of the record.    See, e.g., Tr. 285 (report to Dr. Northway
14  which is consistent with her hearing testimony).

15    Additionally, although plaintiff has a history of drug use, it
16  is unclear why plaintiff's statement that she last used marijuana
17  six months ago would be inconsistent with her statement that she
18  was applying for a medical marijuana card in an attempt to use
19  marijuana legally to control pain.    There is, again, no contrary
20  evidence in the record.    I agree with plaintiff that her past
21  history of illicit drug use does not, by itself, support a negative
22  credibility determination.

23    Nonetheless, the ALJ has given several supportable reasons to
24  reject plaintiff's testimony.    Not all of the reasons for
25  discrediting a claimant must be upheld, as long as substantial
26  evidence supports the ALJ's determination.    Batson v. Commissioner,
27  359 F.3d 1190, 1197 (9th Cir. 2004).    Here, the ALJ noted the lack
28  of objective findings in the record to support her complaints, the

49 - FINDINGS & RECOMMENDATION

inconsistency in her testimony regarding the circumstances of her alleged 2001 car accident, the lack of evidence supporting her alleged attempted suicide, the discrepancies in her abilities on physical examination compared with observation, the discrepancies in her stated limitations compared with her daily activities (such as what she could carry, and the fact that at one point, she still went for walks and had hobbies), and her history of theft, which is suggestive of unreliability.

Substantial evidence supports the ALJ's rejection of plaintiff's subjective testimony regarding her pain and functional limitations.

IV.   RFC

As noted above, plaintiff argues that the ALJ erred by failing to consider her combined impairments and her inability to sustain work performance, in determining her RFC.  She contends that the ALJ failed to consider the "interplay" of plaintiff's depression-related limitations with her physical impairments and pain.  She argues that the evidence shows that she requires a "tremendous degree of flexibility in her job," including taking breaks whenever necessary and leaving early or being absent at least two times per month.  Pltf's Mem. at p. 8.  She also argues that her difficulty coping with stressors found in a competitive work environment would result in frequent episodes of decompensation of extended duration. Id. at pp. 8-9.

The ALJ explained that the record did not include objective evidence supporting plaintiff's alleged physical limitations.  Tr. 31.  He specifically noted the absence of nerve conduction studies, x-rays, or MRIs that would support her alleged physical

50 - FINDINGS & RECOMMENDATION

1    impairments.   <u>Id.</u>   He also noted discrepancies in her stated
2    functional limitation and what was observed by a physician.   <u>Id.</u>
3    (citing Dr. Brewer's observation of plaintiff spontaneously
4    abducting her arm to 170 degrees spontaneously, but claiming on
5    testing, that she could not abduct it more than 80 degrees.   Tr.
6    269).   The ALJ further disregarded the references by Dr. Northway
7    and Dr. Joffe to plaintiff's fatigue and sluggishness for the
8    reasons discussed above.   <u>Id.</u>

9        Notably, plaintiff cites to no physical limitations assessed
10   by any treating, examining, or non-examining health care
11   practitioner based on her alleged radiculopathy or neuropathy.   She
12   also points to no limitations assessed by a mental health
13   practitioner prior to the date she was last insured.   Dr. Joffe's
14   limitations, as previously discussed, which are moderate to marked,
15   in a couple of categories, were assessed after the last insured
16   date.   Plaintiff cites to no evidence in support of her position
17   that her impairments mandate breaks from the workday at will,
18   leaving early, and periodic absences.

19       I need not repeat here the discussions related to plaintiff's
20   arguments regarding the severity of her depression and her
21   credibility.   I incorporate them, however, because given the ALJ's
22   conclusions on those issues, which are supported by substantial
23   evidence, together with the ALJ's independent discussion of her RFC
24   and the reasons articulated by the ALJ in support of the RFC, the
25   ALJ's RFC is supported by substantial evidence in the record.
26   Because the RFC is supported, the hypothetical given to the VE was
27   not in error.

28                              CONCLUSION

51 - FINDINGS & RECOMMENDATION

1      The Commissioner's determination of non-disability should be
2  affirmed.

3                            SCHEDULING ORDER

4      The Findings and Recommendation will be referred to a district
5  judge.   Objections, if any, are due August 28, 2009.   If no
6  objections are filed, then the Findings and Recommendation will go
7  under advisement on that date.

8      If objections are filed, then a response is due September 11,
9  2009.   When the response is due or filed, whichever date is
10  earlier, the Findings and Recommendation will go under advisement.

11
12      IT IS SO ORDERED.

13                  Dated this  13th  day of  August       , 2009.

14

15

16                         /s/ Dennis James Hubel
17  _____  Dennis James Hubel
                                      United States Magistrate Judge
18

19

20

21

22

23

24

25

26

27

28

52 - FINDINGS & RECOMMENDATION